# In the United States Court of Federal Claims

No. 09-612L
Filed: October 13, 2011
**TO BE PUBLISHED**

*********************************************

|  |  |  |
|---|---|---|
| | * | Takings; U.S. Const. Amend. V; |
| | * | Rails-To-Trails Act, 16 U.S.C. § 1247(d) |
| | * | (2006); |
| | * | Summary Judgment, RCFC 56(a); |
| | * | Certification of Question of State Law |
| CONNIE and DOUGLAS | * | (Michigan Supreme Court Rule |
| THOMPSON, *et al.*, | * | 7.305(b)(1)); |
| | * | ICC Termination Act of 1995, Pub. L. |
| Plaintiffs, | * | 104-88, 109 St. 803 (1995), 49 U.S.C. |
| | * | § 10903; |
| v. | * | Notice of Interim Trail Use, 49 C.F.R. § |
| | * | 1152.29(d); |
| THE UNITED STATES, | * | Railroad Revitalization and Regulatory |
| | * | Reform Act of 1976, Pub. L. No. 94- |
| Defendant. | * | 210, 90 Stat. 31 (1976); |
| | * | Transportation Act of 1920, Pub. L. No. |
| | * | 66-152, 41 Stat. 456 (1920); |
| | * | Tucker Act, 28 U.S.C. § 1496 (2006); |
| | * | 1855 Mich. Pub. Act No. 140; |
| | * | 2 Mich. Comp. Laws § 11135 (1929); |
| | * | 49 C.F.R. §§ 152.26(a), 1152-29(c)-(d). |

*********************************************

**Mark F. Hearne, II, Meghan S. Largent, Lindsay S.C. Brinton**, Clayton, Missouri, Counsel for Plaintiffs.

**J. Nathaniel Watson**, United States Department of Justice, Environment and Natural Resources Division, Washington, D.C., Counsel for the Government.

**MEMORANDUM OPINION AND ORDER REGARDING THE PARTIES'
CROSS-MOTIONS FOR SUMMARY JUDGMENT
IN THIS RAILS-TO-TRAILS ACT CASE.**

**BRADEN, *Judge*.**

## I.    RELEVANT STATUTORY BACKGROUND.

In 1920, Congress enacted the Transportation Act delegating to the Interstate Commerce Commission ("ICC") authority to regulate the closure of railroad rights-of-way. *See* Transportation Act of 1920, Pub. L. No. 66-152, 41 Stat. 456 (1920). In 1976, the 1920 Act was

amended to strengthen the ICC's authority in this regard.  *See* Railroad Revitalization and Regulatory Reform Act of 1976, Pub. L. No. 94-210, 90 Stat. 31 (1976).

On March 28, 1983, Congress enacted the Rails-To-Trails Act, as part of the National Trails System Act Amendments of 1983.  Pub. L. No. 98-11, Title II, 97 Stat. 42, 48 (codified at 16 U.S.C. § 1247(d) (1994) ("Rails-To-Trails Act")).  The 1920 Transportation Act, as subsequently amended by, *inter alia*, the Railroad Revitalization and Regulatory Reform Act and the Rails-To-Trails Act, requires that a railroad request permission from the Surface Transportation Board ("STB")[1] before it abandons service on any rail line.  49 U.S.C. § 10903(a)(1) (2006). Within 20 days thereafter, the STB is required to publish a notice in the FEDERAL REGISTER of the railroad's intent to abandon a rail line.  *See* 49 C.F.R. § 1152.26(a). After notice is published, any party interested in creating a public trail on the abandoned railroad right-of-way may file a petition stating the purpose of such use and its intent to assume responsibility for maintenance of the trail.  *See* 49 C.F.R. § 1152.25(a)(1).

If the railroad is willing to negotiate to allow the right-of-way to be used for trail use, the STB issues a Notice of Interim Trail Use ("NITU") that delays disposition of the right-of-way for up to 180 days.  *See* 49 C.F.R. §1152.29(d).  Under the Rails-To-Trails Act, "use of [otherwise abandoned railroad rights-of-way as public trails] shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes."  16 U.S.C. § 1247(d); *see also Ladd* v. *United States*, 630 F.3d 1015, 1025 (Fed. Cir. 2010) ("[T]he NITU forestalls or forecloses the landowners' right to unencumbered possession of the property."), *reh'g en banc denied*, 646 F.3d 910 (Fed. Cir. 2011).  If an agreement is reached to convert the right-of-way to public trail use, the railroad may nevertheless reassert railroad use in the future.  *See* 49 C.F.R. § 1152.29(d).

## II.   RELEVANT FACTS.[2]

In 1854, the Oakland & Ottawa Railroad Company (the "O & O Railroad") acquired two rights-of-way in Ionia County, Michigan.  Pl. PFUF Exs. A37-38, A160-161.  The next year, the O & O Railroad merged with the Detroit & Milwaukee Railroad Company ("D & M Railroad"). *See* 1855 Mich. Pub. Act No. 140 §§ 3-4 (attached to Plaintiffs' August 11, 2010 Motion For Partial Summary Judgment as App. A).  The D & M Railroad continued to acquire railroad rights-of-way.  Pl. PFUF Exs. A1-30, 33-36, 39-40.  By 1857, D & M Railroad had constructed a continuous rail line between milepost 137.83 southeast of Lowell, Michigan and milepost 122.0

---

[1] In 1995, the duties of the ICC were transferred to the STB.  *See* ICC Termination Act of 1995, Pub. L. 104-88, 109 Stat. 803 (1995).

[2] The relevant facts discussed herein were derived from the exhibits attached to Plaintiffs' August 11, 2010 Proposed Findings of Uncontroverted Fact ("Pl. PFUF Exs. A, A1-150, B-JJ"). Pl. PFUF Ex. A is a 32-page affidavit, executed on August 10, 2010, by Meghan S. Largent, one of Plaintiffs' attorneys, who conducted searches of various land records.  Pl. PFUF Exs. A1-150 are exhibits to the Largent Affidavit.

just east of Prairie Creek, Michigan ("the Line").  Pl. PFUF Ex. B at 31-32.[3]  Subsequently, the D & M Railroad changed its name to the Detroit Grand Haven & Milwaukee Railroad ("DGH & M Railroad"), Pl. PFUF Ex. B at 32, and acquired an additional right-of-way.  Pl. PFUF Exs. A31-32.

In 1882, the Grand Trunk Western Railroad ("Grand Trunk Western") acquired the DGH & M Railroad, and the two railroads merged their assets in 1928.  Pl. PFUF Ex. B at 32.  Grand Trunk Western remained in business until 1986, when it was acquired by the Straits Corporation, which was later renamed the Central Michigan Railroad Company.  Pl. PFUF Ex. B at 33.  In 1993, the Grand Rapids Eastern Railroad ("GRE Railroad") acquired the Line.  Pl. PFUF Ex. B at 33.  In 1999, the GRE Railroad merged with Mid-Michigan Railroad, now a subsidiary of RailAmerica, Inc. ("RailAmerica"), which operated the Line until 2007.  Pl. PFUF Ex. B at 33.

On May 16, 2007, the West Michigan Trails and Greenways Coalition (the "Coalition") met with RailAmerica to discuss converting the Line from railroad use to public trail use.  Pl. PFUF Exs. C, D.  On December 18, 2007, the Mid-Michigan Railroad (the "Railroad") filed a Petition for Exemption with the STB to abandon the Line.  Pl. PFUF Ex. B.

On January 7, 2008, the STB issued a notice of the Railroad's December 18, 2007 Petition to abandon the Line.  *See* 73 FED. REG. 1263 (Jan. 7, 2008).

On January 22, 2008, the Coalition requested that the STB issue a NITU by filing a Statement Of Willingness To Assume Financial Responsibility with the STB.  Pl. PFUF Exs. I, J at 3.  On April 3, 2008, the STB issued a NITU, authorizing the Coalition and the Railroad to engage in an 180-day negotiation period.  Pl. PFUF Ex. J at 3-4, 6.  These negotiations failed.

On October 2, 2008, the Friends of the Fred Meijer Heartland Trail ("the Friends") interceded and requested that the STB extend the April 3, 2008 NITU for an additional 180 days to allow additional negotiations to take place.  Pl. PFUF Exs. P, Q.  On October 28, 2008, the STB issued a new NITU, designating the Friends as the proponent of the trail and allowing negotiations to proceed until April 27, 2009.  Pl. PFUF Ex. Q at 2.

On October 31, 2008, an agreement was reached and the Railroad transferred the Line to the Friends via a quitclaim deed.[4]  Pl. PFUF Ex. T.  In exchange, the Friends paid the Railroad

---

[3] A series of "Val Maps," created by the Grand Trunk Western Railroad and filed with the Government were submitted by Plaintiffs as Pl. PFUF Exs. A42-50; *see also* Pl. PFUF Ex. A ¶47 (describing the provenance of the maps).  Plaintiffs did not state with what agency these maps originally were filed.  The maps "list[ ] and depict[ ] the deeds or other methods by which [the railroad] acquired an interest in its right-of-way for the relevant portions of the rail line" and now are stored at the National Archives.  Pl. PFUF Ex. A ¶47.  The "Val Maps," however, are not official *Michigan* land records and the file stamp on some of the maps is illegible.

[4] A quitclaim deed is "[a] deed that conveys a grantor's complete interest or claim in certain real property but that neither warrants nor professes that the title is valid."  BLACK'S LAW DICTIONARY 477 (9th Ed. 2009).

3

$1 million as consideration.  Pl. PFUF Exs. T, U.  On November 19, 2008, the Railroad advised the STB that the sale of the Line to the Friends was completed.  Pl. PFUF Ex. V.

In December 2008, a "Trail Development Agreement" between the Friends and the Coalition was signed, wherein the Friends agreed to "*hold title for* the Railroad corridor from . . . Ionia to Lowell[.]"  Pl. PFUF Ex. W (emphasis added).  Subsequently, the Friends sold part of the Line to the Michigan Department of Natural Resources, Pl. PFUF Exs. BB, EE, and donated the rest, Pl. PFUF Exs. CC, DD, subject to reversion[5] of the Line to the Railroad, if rail service commences in the future.  Pl. PFUF Exs. BB-DD.

## III.   PROCEDURAL HISTORY.

On September 17, 2009, Connie and Douglas Thompson, Saranac Mini-Storage, LLC, and Shirley Zeagler filed a class action Complaint in the United States Court of Federal Claims on behalf of themselves and all similarly situated persons.  On November 12, 2009 Plaintiffs filed an Amended Complaint adding twelve other Plaintiffs.  After obtaining leave of court, Plaintiffs filed a Second Amended Complaint on February 1, 2010 ("Sec. Am. Compl.").  The February 1, 2010 Second Amended Complaint alleges that the NITUs effected a taking of Plaintiffs' property for which they are entitled to just compensation.  Sec. Am. Compl. ¶ 157.  The Second Amended Complaint added other Plaintiffs, but dropped the class allegations contained in the first two versions of the Complaint.[6]

---

[5] A "'reversion' is a future interest remaining in the transferor following the conveyance of certain lesser estates to a transferee, typically when the transferee takes a possessory estate of freehold[.]"  *Preseault* v. *United States*, 100 F.3d 1525, 1533 (Fed. Cir. 1996) (*en banc*) ("*Preseault II*").

[6] At present, Plaintiffs include: Connie and Douglas Thompson ("the Thompsons"); Debra and Robert Austin ("the Austins"); Renee and Troy Baldwin (as successor-in-interest to Robert Baldwin) ("the Baldwins"); Leroy and Lois Bendt ("the Bendts"); Ryan Burch; the Harold Buys Trust; Jeffrey Cady; Elaine and Jon Caswell ("the Caswells"); Otto Christensen; Jerry and Sandy Cook ("the Cooks"); Dan Courtade; Frederick and Linda Ellsworth ("the Ellsworths"); Marcia Emmons; Onnette and Ricky Feehan ("the Feehans"); Roger and Sandra Flinn ("the Flinns"); Fay and Marcia Fountain ("the Fountains"); Bobbie Fox; Sherry Free; Paul Geiger II; Barbara Harrington; Harold and Karen Haskins ("the Haskins"); Larry Heffelfinger; Hilda and Jay Hulbert, Jr. ("the Hulberts"); Cindy and Roger Lodholtz ("the Lodholtzs"); Michael McCaul; Shirley Patrick; Qua-ke-zik Sportsman's Club ("Qua-ke-zik"); Karissa Roth (*nee* Brown) ("Roth"); Saranac Mini Storage, LLC ("Mini Storage"); Saranac Properties, LLC ("Saranac"); Thomas Simpson; Corie Smith; Anita and Robert Talcott ("the Talcotts"); TWR Properties, LLC ("TWR"); Vanderhyde-Ionia, LLC ("Vanderhyde-Ionia"); Mary and Norman Vernon ("the Vernons"); Donald and Margaret Videan ("the Videans"); Shirley Zeagler; Albert Zigmont; The Helen Zigmont Trust ("Zigmont Trust"); and Mary and William Zigmont ("the Zigmonts").  The Helen Zigmont Trust is not listed as a Plaintiff in the caption of the Second

On August 11, 2010, eighteen Plaintiffs filed a Motion For Partial Summary Judgment, together with a Memorandum in Support ("Pl. Mot."),[7] for a ruling that their property rights were taken by operation of the Rails-To-Trails Act and therefore they are entitled to just compensation under the Fifth Amendment to the United States Constitution.  On September 8, September 29, and October 18, 2010, the Government filed unopposed Motions For Extension Of Time, that the court granted.

On October 20, 2010, the Government filed a Cross-Motion For Partial Summary Judgment And Opposition To Plaintiffs' Motion For Partial Summary Judgment ("Gov't Cross Mot.").

On November 19, 2010, Plaintiffs filed an Unopposed Motion For Extension of Time that the court granted.  On November 24, 2010, Plaintiffs filed a Response To The Government's Cross-Motion And A Reply To The Government's Response ("Pl. Resp. & Reply").

On December 1 and 14, 2010, the Government filed additional unopposed Motions For Extension Of Time that were granted by the court.  On December 17, 2010, the Government filed a Reply To Plaintiffs' Cross-Motion Response ("Gov't Reply").  Plaintiffs filed Notices Of Supplemental Authority on: December 14, 2010; February 3, 2011; February 14, 2011; April 6, 2011; April 11, 2011; April 13, 2011; May 9, 2011; and July 8, 2011.

On May 26, 2011, oral argument was held, wherein the court requested supplemental briefing as to whether the case involved any unresolved questions of state law that should be certified to the State of Michigan Supreme Court ("Michigan Supreme Court").  Pursuant to that request, on June 30, 2011, Plaintiffs and the Government filed Supplemental Briefs.

---

Amended Complaint.   The Second Amended Complaint, however, includes allegations identifying the Zigmont Trust as a plaintiff.  Sec. Am. Comp. ¶¶ 124-126.

[7] Plaintiffs that moved for summary judgment are: the Austins, the Baldwins, Burch, Christensen, the Caswells, Emmons, the Flinns, Fox, the Haskins, Heffelfinger, Qua-ke-zik, Roth, Smith, Vanderhyde-Ionia, the Vernons, the Videans, the Zigmonts, and the Zigmont Trust.  As explained herein, six of these Plaintiffs, *i.e.*, the Caswells, Emmons, Fox, Smith, Vanderhyde-Ionia, and the Vernons, claim ownership of properties conveyed by deed in the 19th century for railroad right-of-way use.  Those six Plaintiffs are referred to as the "Conveyance Plaintiffs."  The twelve remaining Plaintiffs who moved for summary judgment are referred to as the "Non-Conveyance Plaintiffs," *i.e.*, the Austins, the Baldwins, Burch, Christensen, the Flinns, the Haskins, Heffelfinger, Qua-ke-zik, Roth, the Videans, the Zigmonts, and the Zigmont trust.  The Railroad is alleged to have acquired rights-of-way over the Non-Conveyance Plaintiffs' properties either by condemnation and/or prescription.

## IV.     JURISDICTION.

### A.     Regarding Plaintiffs' Fifth Amendment Takings Clause Claims.

The jurisdiction of the United States Court of Federal Claims is set forth in the Tucker Act, 28 U.S.C. § 1491 (2006).  Under the Tucker Act, the court may "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon it whenever the substantive right exists."  *United States* v. *Testan*, 424 U.S. 392, 398 (1976).  Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages.  *See Fisher* v. *United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages.").  The burden of establishing jurisdiction falls on the plaintiff.  *See FW/PBS, Inc.* v. *City of Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on plaintiff to allege facts sufficient to establish jurisdiction); *see also* RCFC 12(b)(1).

The money-mandating provision in a takings case is the Fifth Amendment to the United States Constitution.  *See Acceptance Ins. Companies, Inc.* v. *United States*, 503 F.3d 1328, 1336 (Fed. Cir. 2007) ("A Fifth Amendment takings claim falls within the Tucker Act's grant of jurisdiction[,] because it is a claim against the United States founded upon the Constitution.") (internal quotation marks and citations omitted).

In *Preseault* v. *ICC*, 494 U.S. 1 (1990) ("*Preseault I*"), the United States Supreme Court affirmed the constitutionality of the Rails-To-Trails Act, but held that the Tucker Act provides the United States Court of Federal Claims with jurisdiction to adjudicate Takings Clause claims that arise under the Act.  In doing so, the  United States Supreme Court held that a landowner may have a remedy in the United States Court of Federal Claims under the Tucker Act for a takings claim under the Fifth Amendment to the United States Constitution.  *See Preseault I*, 494 U.S. at 12; *see also id*. at 13 ("We reaffirm that a Tucker Act remedy exists unless there are unambiguous indications to the contrary."); *see also Stop the Beach Renourishment, Inc.* v. *Florida Dept. of Envtl. Prot.*, 130 S. Ct. 2592, 2601 (2010) (reaffirming that a taking may occur when the government "recharacterize[s] as public property[,] what was previously private property").

Subsequently, Plaintiff in that case filed a claim in the United States Court of Federal Claims seeking compensation for the taking that he allegedly suffered by operation of the Rails-To-Trails Act.  *See Preseault* v. *United States*, 27 Fed. Cl. 69 (Fed. Cl. 1992).  The United States Court of Federal Claims held that the plaintiffs did not have any compensable property interest as a matter of state property law because of subsequent federal enactments.  *Id*. at 90-91.  In *Preseault* v. *United States*, 100 F.3d 1525 (Fed. Cir. 1996) (*en banc*) ("*Preseault II*"), however,

the United States Court of Appeals for the Federal Circuit overturned the lower court's ruling that state law property rights could be altered by operation of federal law, and held that the Preseaults had a compensable property right under the relevant law that was affected by operation of the Rails-To-Trails Act. *Id.* at 1530, 1537-40; *see also id.* at 1529-30 (describing the chronology of the case).

The United States Court of Appeals for the Federal Circuit also has held that a takings claim may accrue upon the STB's issuance of a NITU. *See Caldwell* v. *United States*, 391 F.3d 1226, 1233, 1235 (Fed. Cir. 2004), *cert. denied* 546 U.S. 826 (2005) ("The taking, if any, when a railroad right-of-way is converted to interim trail use under the [Rails-To-]Trails Act occurs when state law reversionary property interests that would otherwise vest in the adjacent landowners are blocked from so vesting." "We . . . hold that the appropriate triggering event for any takings claim under the [Rails-To-]Trails Act occurs when the NITU is issued.").

In this case, the initial NITU was issued on April 3, 2008, and was extended on October 28, 2008.  Pl. PFUF Exs. J, Q.  Since the Complaint was filed on September 15, 2010, the claims alleged therein were filed within the six-year statute of limitations. *See John R. Sand & Gravel Co.* v. *United States*, 552 U.S. 130, 132-34 (2008) (holding that the Tucker Act's six-year statute of limitations is absolute, jurisdictional, and requires the trial court to examine this issue *sua sponte*). Accordingly, the court has determined it has jurisdiction to adjudicate the claims alleged in the September 15, 2010 Complaint.

### B.    Regarding The Property Rights At Issue And Subject To Michigan State Law.

A threshold jurisdictional issue in this case is whether the principles of federalism and comity require the court to certify questions of property law that arise in this case to the Michigan Supreme Court.  *See* Mich. Sup. Ct. Rule 7.305(B)(1) ("When a federal court . . . considers a question that Michigan law may resolve and that is not controlled by Michigan Supreme Court precedent, the court may . . . certify the question to the Michigan Supreme Court."); *see also* M. Bryan Schneider, *"But Answer Came There None": The Michigan Supreme Court And The Certified Question of State Law*, 41 WAYNE L. REV. 273, 306 (1995) ("In terms of what courts are allowed to certify questions of state law to the supreme court, the Michigan rule is at least as expansive as any other state's provision.").[8]

---

[8] The Michigan Supreme Court does not usually entertain certified questions.  *See* Schneider, 41 WAYNE L. REV. at 315 (1995) ("Not only does the court refuse to answer most questions, but it generally fails to state the reasons for its refusal.  Generally, a federal court certifying a question to the Michigan Supreme Court should not be at all surprised to see this response: 'On order of the Court, the question[s] certified by the [insert certifying court here] are considered, and the Court respectfully declines the request to answer the question[s].'") (alterations in original).

One reason that Court does not routinely entertain certified questions appears to be because the constitutionality of Michigan's certification rule is an unresolved issue among the Justices.  *See, e.g.*, *In re: Certified Questions from the U.S. Court of Appeals for the Sixth*

In the leading Rails-To-Trails Act case, the United States Court of Appeals for the Federal Circuit engaged in an extensive analysis of state property law where the relevant state supreme court declined to entertain a certified question. *See Preseault II*, 100 F.3d at 1530, 1534-37. Therein, our appellate court observed: "[i]deally th[e] question would be decided by the [s]tate . . . courts, utilizing their knowledge of and experience with their state's property law." *Id.* at 1534. Recognizing that certification might not always be a viable option, in *Toews* v. *United States*, 376 F.3d 1371, 1381 (Fed. Cir. 2004), our appellate court advised that, "courts have a duty to decide the cases before them whenever it reasonably can be done[.]"[9] *Id.*

In the court's judgment, certification of the relevant issues of Michigan property law is not required in this case because the Michigan Supreme Court has resolved these issues in three key cases. In *Quinn* v. *Pere Marquette Ry.*, 239 N.W. 376 (Mich. 1931), the Michigan Supreme Court held that the language of a deed governs whether a railroad right-of-way is obtained in fee simple absolute or a lesser estate. *Id.* at 378-79. In *Mich. Cent. R.R.* v. *Garfield Petroleum Corp.*, 290 N.W. 833 (Mich. 1940), the Court held that when a railroad acquires a right-of-way by prescription[10] or condemnation[11] it cannot acquire more than an easement for railroad purposes. *Id.* at 839. And, in *Michigan Dep't. of Natural Res.* v. *Carmody-Lahti Real Estate, Inc.*, 699 N.W.2d 272 (Mich. 2005), the court held that a railroad easement does not extend to other public purposes such as railbanking. *Id.* at 285-87.

For these reasons, the court has determined, in this case, that "[b]asic fairness, avoidance of unwarranted delay and the imposition of additional costs on the parties, and conservation of judicial resources, all dictate that [the court] should decide this case[.]" *See Toews*, 376 F.3d at 1381.

---

*Circuit*, 472 Mich. 1225, 1225-26 (2005) (Young, J. concurring) (declining request to certify stating his belief that certification violates the Michigan Constitution, but stating that he nevertheless "honor[s] the majority position of this Court and participate[s] in certified question matters."); *see also id.* at 1225 (Weaver, J. concurring) (same).

[9] Accordingly, the United States Court of Federal Claims has construed state property law issues in several recent Rails-To-Trails Act cases, without requesting certification. *See, e.g.*, *Whispell Foreign Cars, Inc.* v. *United States*, No. 09-315L, 2011 WL 3805918 at *5-6 (Aug. 29, 2011) (Hewitt, C.J.) (applying Florida law); *Capreal, Inc.* v. *United States*, 99 Fed. Cl. 133, 140-46 (Fed. Cl. 2011) (Wheeler, J.) (applying Massachusetts law); *Anna F. Nordhus Family Trust* v. *United States*, 98 Fed. Cl. 331, 336-39 (Fed. Cl. 2011) (Wheeler, J.) (applying Kansas law); *Macy Elevator, Inc.* v. *United States*, 97 Fed. Cl. 708, 718 n. 15 (Fed. Cl. 2011) (Firestone, J.) (applying Indiana law).

[10] Prescription is "[t]he acquisition of title to a thing (esp. an intangible thing such as the use of real property) by open and continuous possession over a statutory period." BLACK'S LAW DICTIONARY 1302 (9th ed. 2009).

[11] Condemnation is "[t]he determination and declaration that certain property (esp. land) is assigned to public use, subject to reasonable compensation; the exercise of eminent domain by a governmental entity." BLACK'S LAW DICTIONARY 332 (9th ed. 2009).

V.      STANDING.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005) (*quoting Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992)). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan*, 504 U.S. at 560-61. Specifically, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 180-81 (2000) (internal citations omitted).

The February 1, 2010 Second Amended Complaint alleges that each of the Plaintiffs is the owner of a fee simple estate that abuts and underlies a railroad easement that has been subjected to "railbanking." Sec. Am. Compl. ¶¶ 7-129 (alleging the land interests of each Plaintiff).  Plaintiffs further claim that the NITU process "operated to take the Plaintiffs' reversionary right to [their] land by pre-empting or forestalling these Plaintiffs' reversionary right[s] to their property." Sec. Am. Compl. ¶ 157 (internal citation omitted).  Thus, the Second Amended Complaint has alleged injury in fact that can be redressed by a ruling requiring that the United States pay just compensation for the alleged taking of Plaintiffs' property interests. Therefore, Plaintiffs have established standing to seek an adjudication of their takings claims, although the precise nature of their property interest remains for the court's final determination, as discussed below.

VI.     STANDARD OF REVIEW REGARDING SUMMARY JUDGMENT.

On a motion for summary judgment, the moving party must show that there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law.  *See Duramed Pharm., Inc.*, v. *Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011) ("Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see also* RCFC 56(c).  Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment.  *See Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").  The "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* at 247-48.  To avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable finder of fact to return a verdict for that party. *Id.* at 248-50.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp.* v. *Catrett,* 477 U.S. 317, 325 (1986) (holding the moving party must meet its burden "by 'showing'—that is, pointing out to the [trial] court—that

there is an absence of evidence to support the nonmoving party's case"); *see also Wavetronix LLC* v. *EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009) ("The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to show the existence of a genuine issue for trial. *See Shum* v. *Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010) ("If the moving party meets its burden of establishing that there is no genuine issue of material fact and is entitled to judgment as a matter of law, then the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.").

A trial court is required to resolve any doubt over factual issues in favor of the nonmoving party. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ("[O]n judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.") (alterations in original) (internal quotation marks and citations omitted). Further, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson,* 477 U.S. at 255-56; *see also Rembrandt Data Technologies, LP* v. *AOL, LLC,* 641 F.3d 1331, 1336 (Fed. Cir. 2011) ("[A]ll justifiable inferences [are drawn] in favor of the non-moving party[.]")

## VII.   GOVERNING PRECEDENT.

The United States Court of Appeals for the Federal Circuit has held *en banc* that Takings Clause claims that arise from railbanking proceedings under the Rails-To-Trails Act must be analyzed under a three-part test. First, the trial court must determine "who owned the strips of land involved," *i.e.*, did the railroad "acquire only easements,[12] or did it obtain fee simple estates"[13] under applicable state law? *See Preseault II*, 100 F.3d at 1533. Second, "*if* the railroad acquired only easements, were the terms of the easements limited to use for railroad purposes, or did they include future use as public recreational trails[?]" *Id.* (emphasis added). Third, if the railroad acquired a "broad enough" easement under applicable state law, did "these easements terminate[] prior to the alleged taking so that the property owners at the time held fee simples unencumbered by the easements[?]" *Id.*

---

[12] In *Preseault II*, the United States Court of Appeals for the Federal Circuit observed that: "an easement is not . . . a possessory estate of freehold. Traditional characterization describes an easement as a 'use' interest, sometimes an 'incorporeal hereditament,' but not a 'possessory' interest in the land." 100 F.3d at 1533.

[13] The parties often refer to the property interest at issue as a "fee" or "fee simple." The United States Court of Federal Claims has held that an indefinite interest in a property that is not burdened by reversionary interests or conditions subsequent more properly is known as a "fee simple absolute." *See Chevy Chase Land Co.* v. *United States*, 37 Fed. Cl. 545, 564 (Fed. Cl. 1997) ("A fee simple absolute (often inaccurately described as 'fee simple') is of infinite duration, and comprises the greatest estate that one can possess.") (*citing* ROGER A. CUNNINGHAM ET. AL., THE LAW OF PROPERTY, § 2.2, at 29 (2d ed. 1993)).

## VIII. PLAINTIFFS' AUGUST 11, 2010 MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING CONVEYANCE PLAINTIFFS.

In this case, the so-called "Conveyance[14] Plaintiffs" have proffered three deeds that they argue did not transfer a fee simple absolute to the Railroad, but only an easement. Pl. Mot. at 8-10, 17-25; Sec. Am. Compl. ¶¶ 11, 14, 20, 29, 32, 44, 50, 56, 68, 71, 86, 89, 101, 110, 113, 116, 125, 128.

### A. *Preseault II*, Step 1: Michigan Law Governs The Property Rights At Issue.

#### 1. Michigan Law.

The Conveyance Plaintiffs argue that such terms as "grant," "give," and "across" appear in the deeds at issue and evidence that the Railroad did not acquire a fee simple absolute for rights-of-way. Pl. Mot. at 22-23 (*citing* CAMERON, MICHIGAN REAL PROPERTY LAW (3d ed. 2006) § 10.8). Moreover, the Avery deed contains language restricting the property acquired by the Railroad for "Rail Road purposes, and for no other Purpose." Pl. Mot. at 25 (citing Pl. PFUF Exs. A37-A38). The Lovell and Barber deeds reserved to Lovell and Barber the right to continue using the land, subject to the Railroad's easement. Pl. Mot. at 23-24 (discussing Pl. PFUF Exs. A25-26, 29-30). For this reason, the Ionia County, Michigan, Register of Deeds describes the Barber and Lovell conveyances as "right[s] of way," evidencing that the Railroad acquired only an easement in these properties. Pl. Mot. at 25 (citing JAMES G. CAMERON, MICHIGAN REAL PROPERTY LAW, §6.6, p. 32 (3d ed. 2009 Supp.) (allowing contemporaneous documents to be considered in construing a deed)).

The Government responds that, as a matter of Michigan law, the deeds conveyed a fee simple absolute to the Railroad so there is "no owner of a separate underlying property interest to claim the rights of the servient estate holder." *Preseault II*, 100 F.3d at 1552; *see also Quinn* v. *Pere Marquette Ry. Co.*, 239 N.W. 376, 379 (Mich. 1931) (holding that, under Michigan law, a deed that conveys a parcel of land "to be used for railroad purposes" may still convey a fee estate in that property). Each deed in this case specifies "all and singular the hereditaments and appurtenances thereunto belonging or in anywise appertaining and the reversion and reversions remainder and remainders rents fees and profits thereof and all the estate rights with interest claim or demand whatsoever[,]" or materially identical language. Gov't Cross Mot. at 11-13. The words "right-of-way" and "easement," however, do not appear in any of the conveyances at issue in this case. Gov't Cross Mot. at 14. Moreover, even though the Avery and Barber deeds state that the property interests being transferred are only for "Rail Road purposes," as a matter of Michigan law, a fee simple absolute interest was conveyed rendering any statements to the contrary "declaration[s] of the purpose of [the] conveyance[s], without [legal] effect to limit the grant." *Quinn*, 239 N.W. at 379. To the extent that the Conveyance deeds are ambiguous, the Government argues that any ambiguity must be construed

---

[14] A "conveyance" is "the voluntary transferring of a right or property." BLACK'S LAW DICTIONARY 383 (9th ed. 2009).

against the grantor.  Gov't Cross Mot. at 14 (*citing Quinn*, 239 N.W. at 379).  Therefore, the property at issue was conveyed to the Railroad in fee simple absolute.

The court's analysis begins with the general proposition that Michigan law views deed language like "right-of-way" presumptively as describing an easement, at least in the railroad context.  *See Carmody-Lahti*, 699 N.W.2d at 280 ("[A] deed *granting* a right-of-way typically conveys an easement, whereas a deed granting *land itself* is more appropriately characterized as conveying a fee or some other estate[.]").  But, in *Carmody-Lahti*, the Michigan Supreme Court distinguished the phrase "right-of-way" from the deed in *Quinn* that conveyed "*all the estate, right, title, claim, and demand whatsoever of the [grantor.]*"  *Id.* at 283 (alteration in original) (*quoting Quinn*, 239 N.W. at 378).  Such language "unambiguously show[s] the grantors' intent to convey their *entire* estate."  *Id.*

The Michigan Supreme Court held that the deed in *Quinn* conveyed a fee simple absolute despite the fact that the deed at issue also contained the following language, *i.e.*,

> sold and conveyed to the . . . Railroad Company '*to be used for railroad purposes only*,' 'a parcel of land one hundred feet in width, lying fifty feet on each side of the center line of the . . . Railroad, as located and established *upon and across the lands* of said parties of the first part[.]

*Quinn*, 239 N.W. at 378 (emphasis added).

*Carmody-Lahti* reinforces the primacy of the term "right-of-way" in a deed.  *See* 699 N.W.2d at 281 ("That the parties described the interest as going 'across' the land reveals that they understood *the right-of-way* as being distinct from the land itself.") (emphasis added).  *Carmody-Lahti* further emphasized that the deed at issue, unlike that in *Quinn*, contained "*no language* that . . . affirmatively indicates that the parties intended to convey a fee simple."  *Id.* (emphasis added).

As a result, the word "across," standing alone, is insufficient, as a matter of Michigan law to establish that only an easement is conveyed, where the deed also contains language suggesting that a fee simple absolute had been conveyed.  *Id.*

### 2.   The Court's Resolution As To The Three Deeds Proffered By The Conveyance Plaintiffs.

Next, the court examines each of the three deeds proffered by the Conveyance Plaintiffs to determine the property right(s) at issue.

### a.   The Avery Deed.

The Avery deed "granted[,] bargained[,] sold[,] remised[,] released[,] aliened and confirmed  . . . [a]ll that certain strip of Land" to the O & O Railroad.  Pl. PFUF Exs. 37-38.  This deed also expressly conveyed "all the Estate right[,] title[,] interest[,] claim and demand whatsoever" to the O & O Railroad and its "successors and assigns forever."  Pl. PFUF Exs. 37-38.  The Avery deed, however, restricted use "by said Rail Road Company for their Rail Road

12

purposes, and for no other [p]urpose." Pl. PFUF Exs. 37-38. Nevertheless, the Avery deed conveyed to the Railroad "the reversion and reversions[,] remainder & remainders[,] rents[,] issues and profits thereof[.]" Pl. PFUF Exs. 37-38. In addition, the Avery deed uses the word "across," as did the *Quinn* deed, wherein the Michigan Supreme Court held the railroad acquired a fee simple absolute. In this context, the court discerns that the word "across" describes the physical location of the strip of land conveyed, *i.e.*, a strip being located "across [Avery's] land in the East half of the North East Quarter" of a larger plot. Pl. PFUF Exs. 37-38. Finally, the Avery deed does not use the term "right-of-way." As the Michigan Supreme Court has held: "'Where the land itself is conveyed, although for railroad purposes only, *without specific designation of a right of way*, the conveyance is in fee and not of an easement.'" *Carmody-Lahti*, 699 N.W.2d at 280 (*quoting Quinn*, 239 N.W. at 379 (1931)) (emphasis added).

For these reasons, the court has determined that the Avery deed conveyed to the O & O Railroad a fee simple absolute interest in the described strip of land. Therefore, as a matter of law, the NITU did not forestall any reversionary rights of the Plaintiffs whose claims depend on the Avery Deed.

### b.    The Lovell Deed.

The Lovell deed also uses the words "granted[,] bargained[,] sold[,] remised[,] released[,] aliened [and] confirmed[.]" Pl. PFUF Exs. 29-30. This deed also conveyed these rights to the D & M Railroad's "successors and assigns forever." Pl. PFUF Exs. 29-30. In addition, the Lovell deed further transferred to the D & M Railroad any "estate right title," including "the reversion and reversions[,] remainder and remainders[,] rents[,] issues and profits thereof[.]" Pl. PFUF Exs. 29-30. The Lovell deed, however, did not restrict the railroad's use of the land to railroad purposes. Pl. PFUF Exs. 29-30.

As with the Avery deed, the Lovell deed's use of the word "across" describes the location of the strip of land that is being conveyed. Pl. PFUF Exs. 29-30 (describing "[a] strip of land . . . as surveyed staked out & located by said Company across that part owned by [the Lovells].") Finally, the Lovell deed requires the railroad to "drain said land so that no water shall accumulate[,] . . . and to make and maintain a good board fence on each side of said road across said land & suitable fence crossings where & when needed," Pl. PFUF Exs. 29-30. But, these restrictions do not create any reversionary interests and appear to have been imposed by the Lovell deed on the Railroad to protect Lovell's remaining property interests.

For these reasons, the court has determined that the Lovell deed conveyed to the Railroad a fee simple absolute interest in the described strip of land. Therefore, as a matter of law, the NITU did not forestall any reversionary rights of the Plaintiffs whose claims depend on the Lovell Deed.

### c.    The Barber Deed.

The Barber deed states that it "granted[,] bargained[,] sold[,] remised[,] released[,] aliened and confirmed" certain land to the Railroad. Pl. PFUF Exs. 25-26. It also expressly states that the land is "quit claimed" by the grantor and conveys to the Railroad "the reversion

and reversions[,] remainder and remainders[,] rents[,] fees[,] and profits thereof[.]" Pl. PFUF Exs. 25-26. In addition, the Barber deed refers to "the rights of the public for a highway," suggesting that the scope of the conveyance entails that future use may be made of the strip of land by the Railroad for other public purposes. Pl. PFUF. Exs. 25-26.

Here again, the court discerns that the use of the word "across" in the deed refers to the location of the strip of land being conveyed, *i.e.*, "a strip of land One hundred feet wide across the farm of the [grantors]." Pl. PFUF Exs. 25-26. As such, it describes a strip that runs in the middle of a farm that otherwise belonged to the Barbers. *Id.*

And, as with the Avery deed, the words "for Rail Road purposes" do appear in the Barber deed, but they do not limit the conveyance to an easement for the same reasons discussed above. *See Carmody-Lahti*, 699 N.W.2d at 280. The Barber deed differs, however, from the Avery deed in that it conveys the strip of land to the Railroad "*so long as* the said above described premises shall be used for Rail Road purposes." Pl. PUF Exs. 25-26 (emphasis added).

For these reasons, on one hand, the court has determined that the Barber deed did not convey an easement to the railroad for the reasons discussed herein, and denies Plaintiffs' Motion for Summary Judgment with respect to Plaintiffs whose claims are tied to the Barber deed.[15] On the other hand, the court declines to grant summary judgment in the Government's favor because the Government has not demonstrated that Plaintiffs whose claims are based on the Barber deed have *no* property interest in the Line that was affected by the NITU.[16]

---

[15] Plaintiffs Emmons, Fox, and Smith are the alleged successors-in-interest to the land originally conveyed by the Barber deed. Pl. Mot. at 10 (citing Pl. PFUF Exs. A79-80 (Emmons), A87-88 (Fox), A113-114 (Smith)).

[16] The parties did not address the importance of the phrase "so long as" that typically conveys a fee simple *determinable* under Michigan law (as opposed to a fee simple absolute). *See St. Mary's Med. Ctr. of Saginaw, Inc.* v. *Carpenter*, 2001 WL 1545918 (Mich. App. Ct. 2001) (*per curiam*) (unpublished) ("The special limitation characterizing [a] determinable fee is typically introduced by words such as 'until,' 'during,' and 'so long as.'") (*quoting* CAMERON, MICHIGAN REAL PROPERTY LAW, § 7.10 at p. 247); *see also Chevy Chase*, 37 Fed. Cl. at 564 (summarizing types of defeasible fee estates). The Cameron treatise that *St. Mary's* quotes is an older edition of the treatise, which is now outdated. Throughout this opinion, the court has cited and referred to the newer, third edition, which was published in 2006. In the most recent edition, the text quoted by the *St. Mary's* Court can be found at CAMERON, MICHIGAN REAL PROPERTY LAW, § 7.9 at 269 (3d ed. 2006).

A fee simple determinable is "[a]n estate that will automatically end and revert to the grantor if some specified event occurs[.]" BLACK'S LAW DICTIONARY 692 (9th ed. 2009). The parties did not address (1) whether the Barber deed may have conveyed a fee simple *determinable* rather than a fee simple *absolute* nor (2) what consequences this might have for a Rails-To-Trails Act takings claim. The court therefore declines to grant summary judgment for

Because the court has determined that the Conveyance Plaintiffs either have no property interest over the Line (Avery and Lovell deeds) or have a not-yet-defined property interest in the line (Barber deed), it is unnecessary to conduct the rest of the *Preseault II* inquiry.

## IX.   PLAINTIFFS' AUGUST 11, 2010 MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING THE NON-CONVEYANCE PLAINTIFFS.

The Non-Conveyance Plaintiffs contend that the Railroad acquired rights-of-way over their property either by condemnation or prescription.  Pl. Mot. at 7-8.  Because the underlying issues of Michigan property law presented by the Non-Conveyance Plaintiffs differ from those presented by the Conveyance Plaintiffs, the court will discuss each separately.

### A.   *Preseault II*, Step 1: The Property Interests Acquired By The Railroad.

The first step in the *Preseault II* analysis requires the court to determine the property interests acquired by a railroad for a right-of-way.

It is well settled in Michigan law that

> a railroad can only acquire an easement over land by condemnation, it can secure no greater interest by prescription; and a prescriptive right, where there is no color of title, *cannot be broader than the claims which the user evidences*.  Ordinarily, there is no user [*sic*] by a railroad company beyond the use for purposes of right of way.

*Garfield Petroleum*, 290 N.W. at 839 (Mich. 1940) (citation omitted) (emphasis added).[17]

This limitation is implied because the Michigan Constitution limits the use of eminent domain, requiring that "[w]here the interest to be taken is not expressly stated, the condemner is presumed to take no greater interest than an easement, where an easement is sufficient to satisfy the purposes of the taking."  *Id.* at 835.  Thus, "[t]he right to purchase and hold lands for the purposes of the [rail]road . . . must be construed as conferring no right to hold the property in derogation of the purposes for which it was taken."  *Id.* at 834 (internal citations and quotation marks omitted); *see also id.* at 835 ("If, in condemnation proceedings, a railroad is expressly limited 'to enter upon and take possession of and use the said land, franchise, and other property for the purpose of its incorporation,' it would [therefore] appear that the extent of its right and possession would be restricted to railroad purposes.") (*quoting* 2 MICH. COMP. LAWS § 11135 (1929) (authorizing railroads to engage in eminent domain under Michigan law)).  Therefore, as

---

either party with respect to the Government's liability for taking the relevant Plaintiffs' property interests.

[17] Under Michigan law, the property rights that a railroad acquires through condemnation or prescription are the same.  *Id.*  Therefore, the court need not determine how the Railroad acquired the easements at issue.

a matter of law, once a railroad's use ends, all rights in the land acquired by condemnation or prescription revert back to the original property owners, restored in fee simple absolute.

Under Michigan law a prescriptive easement requires only that a railroad's use "must be adverse, under claim of right, continuous (*i.e.*, uninterrupted), open, notorious, peaceable, and with the actual or presumed knowledge or acquiescence of the owner of the servient tenement." JOHN G. CAMERON, MICHIGAN REAL PROPERTY LAW (3d ed. 2006), § 6.11 (*citing, inter alia, Marr* v. *Hemenny*, 297 N.W. 504 (Mich. 1941)).

In this case, the Non-Conveyance Plaintiffs have proffered warranty or quitclaim deeds and local tax records to establish fee simple absolute ownership of the property underlying and abutting the Line.[18]  The Government insists that these plaintiffs are still required to establish an unbroken chain-of-title from the time that the Railroad condemned, or took by prescription, easements over the properties at issue until the time the NITU was issued.  Gov't Cross Mot. at 21-22.

It is axiomatic that "[w]ithout undisputed ownership of . . . property at the time of [a] taking[ ], the [Plaintiffs] cannot maintain a suit alleging that the Government took their property without just compensation."  *Cavin* v. *United States*, 956 F.2d 1131, 1134 (Fed. Cir. 1992) (citing *United States* v. *Dow*, 357 U.S. 17, 20-21 (1958)); *see also Wyatt* v. *United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001).  This burden is met when a plaintiff establishes a property interest in fee simple.  *See Norman* v. *United States*, 63 Fed. Cl. 231, 245 (Fed. Cl. 2004), *aff'd by* 429 F.3d 1081 (Fed. Cir. 2005) ("There is no question that fee simple ownership of real property constitutes a cognizable property interest.").  The United States Court of Appeals for the Federal Circuit, however, has not issued a precedential opinion requiring that a plaintiff alleging a taking by virtue of the issuance of a NITU demonstrate an unbroken chain-of-title to establish a reversionary property interest in land previously acquired by a railroad.

In this case, Plaintiffs proffered authenticated recorded deeds that are required by Michigan law, *see* Mich. Comp. L. § 565.1 ("Conveyance of . . . any estate or interest therein, may be made by deed, signed and sealed by the person from whom the estate or interest is intended to pass . . . and recorded as directed in this chapter, without any other act or ceremony whatever."), as well as local tax records demonstrating that they are the owners of their land.  In a Takings Clause case that arose in the Rails-To-Trails context, the United States Court of Federal Claims has determined that recent deeds and tax records are sufficient to establish a fee simple absolute at the time the railroad acquired a property interest where

---

[18]  *See* Pl. PFUF Exs. A53-55 (the Austins); Exs. A56-57 (Baldwin); Exs. A60-61 (Burch); Exs. A68-72 (Christensen); Exs. A83-84 (the Flinns); Exs. A93-94 (the Haskins); Exs. A95-96 (Heffelfinger); Exs. A103-104 (Qua-ke-zik); Exs. A105-106 (Roth); Exs. A125-126 (the Videans); Exs. A133-148 (the Zigmonts); Exs. A129-132 (the Zigmont trust).  The Val Maps also indicate that portions of some of the Non-Conveyance Plaintiffs' property was obtained by condemnation.  PL. PFUF Exs. A42-50.

> [e]ach Plaintiff . . . presented to the Court a warranty or quit claim deed evidencing when and by what instrument he or she acquired ownership rights in the property. Each Plaintiff also provided evidence of real estate tax payments to Marshall County, Kansas during 2003, the year of the issuance of the NITU. The Plaintiffs furnished a Marshall County, Kansas appraiser's map outlining the Plaintiffs' property and its connection to the railroad right-of-way. While Defendant has reserved its right to challenge the standing of any individual landowner based upon information that may later be discovered, Defendant has not disputed that each named Plaintiff owns a fee simple interest.

*Nordhus Family Trust* v. *United States*, 98 Fed. Cl. 331, 336 (Fed. Cl. 2011).

In this case, the court likewise has determined that the Non-Conveyance Plaintiffs have proffered sufficient evidence to establish a reversionary right in fee simple absolute to property acquired by the Railroad by condemnation or prescription for rights-of-way.

### B.   *Preseault II*, Step 2: The Scope Of The Railroad's Property Interest.

The second step of the *Preseault II* analysis requires the court to determine whether public recreational trail use is within the scope of easements held by the Railroad.

The Non-Conveyance Plaintiffs in this case argue that public recreational trail use was not contemplated either by the original owners of the property or the Railroad when it acquired an easement. Pl. Mot. at 32-33; *see also Preseault II*, 100 F.3d at 1543 (observing that it is "difficult to imagine that either party to the original transfers had anything remotely in mind that would resemble a public recreation trail"). Accordingly, the easements acquired by the Railroad cannot now be expanded for public use. Pl. Mot. at 33.[19]

The Government responds that, "if the terms of the easement when first granted are broad enough under then-existing state law to encompass trail use, the servient estate holder would not be in a position to complain about the use of the easement for a permitted purpose." Gov't Cross Mot. at 25 (*quoting Preseault II*, 100 F.3d at 1552). The Government further argues that land taken by a railroad in Michigan for a right-of-way is deemed to be taken "for public purposes," and that such public purposes extend to recreational trail use. Gov't Cross Mot. at 27 (citing *Detroit Int'l. Bridge Co.* v. *Am. Seed Co.*, 228 N.W. 791, 794 (Mich. 1930)). In other words, so long as an easement is put to use for some public purpose that is not "plainly repugnant" to the

---

[19] As further support for their position, Plaintiffs point out that, as a matter of Michigan law, the public cannot have prescriptive rights in recreational property. *See Barnes* v. *Michigan Air-Line Ry.*, 32 N.W. 426, 426-27 (Mich. 1887) (holding that a railroad's ability to acquire an easement by prescription or condemnation is limited to the original "use proposed to be made of [the land] by the railroad company."); *see also Comstock* v. *Wheelock*, 234 N.W.2d 448, 450 (Mich. App. 1975) ("The public can have no prescriptive right in . . . property for recreational purposes.") (*citing Pigorsh* v. *Fahner*, 177 N.W.2d 466 (Mich. App. 1970), *aff'd* 194 N.W.2d 343 (Mich. 1972)).

originally intended use, public use for another purpose is within the scope of the easement. *See* Gov't Cross Mot. at 26-27 (*quoting Barnes* v. *Michigan Air-Line Ry.*, 32 N.W. 426, 427 (Mich. 1887)).[20]   More importantly, the Government emphasizes that Michigan law now expressly provides that railbanking is considered a public purpose. *See* MICH. COMP. LAWS § 474.51 (1)(3) (2000) ("The preservation of abandoned railroad rights of way for future rail use and their interim use as public trails is declared to be a public purpose.").[21]   The Government also contends that preservation of the railroad right-of-way is, in and of itself, a "railroad purpose." Gov't Cross Mot. at 28. Railbanking furthers the original purpose of the easement by ensuring that railroad rights are available for future use. *See* H.R. Rep. No. 98-28, at 8 (1983), reprinted in 1983 U.S.C.A.N. 112, 120 (stating that the [Rails-To-]Trails Act "will protect railroad interests by providing that the right-of-way can be maintained for future railroad use even though service is discontinued and tracks removed, and by protecting railroad interests from any liability or responsibility in the interim period.").

That Government also insists that it is impossible to determine what interest the railroad actually acquired because the Non-Conveyance Plaintiffs rely solely on valuation maps to establish condemnation. Gov't Cross Mot. at 20-21. But those maps do not indicate whether the railroad acquired an easement or some greater property interest. Gov't Cross Mot. at 21 (*citing Amaliksen* v. *United States*, 55 Fed. Cl. 167, 175 (Fed. Cl. 2003) ("The purpose of [valuation] maps was to identify parcels for valuation, not to distinguish types of ownership.")).

---

[20] In addition, the Government cites a series of cases in which state courts held that trail use is within the scope of an easement for railroad use. Gov't Cross Mot. at 23-24 (citing *Chevy Chase Land Co.* v. *United States*, 733 A.2d 1055, 1059 (Md. 1999), *answering questions certified by* 158 F.3d 574 (Fed. Cir. 1998), *aff'd* 230 F.3d 1375 (Fed. Cir. 1999) (holding under Maryland law, recreational trail use falls within the scope of a railroad easement); *Wash. Wildlife Pres., Inc.* v. *State*, 329 N.W.2d 543, 547 (Minn. 1983) (holding, under Minnesota law, that "[r]ecreational trail use of the land is compatible and consistent with its prior use as a rail line, and imposes no greater burden on the servient estates."); *Barney* v. *Burlington N. R.R.*, 490 N.W.2d 726, 732 (S.D. 1992) (holding, under South Dakota law, recreational trail use is a "public highway" use "compatible and consistent with its prior use as a public railway."), *overruled by Brown* v. *Northern Hills Regional R.R. Authority,* 732 N.W.2d 732 (S.D. 2007); *Rieger* v. *Penn Cent. Corp.*, No. 85-CA-11, 1985 WL 7919, *4 (Ohio Ct. App. May 21, 1985) (unpublished) (holding under Ohio law that "conveyance of a railroad right-of-way to the State of Ohio for use as a recreation trail does not constitute an abandonment of the right-of-way for public travel.")).

The Government's reliance upon *Barney* is misplaced, as this case was overruled. *See Brown*, 732 N.W.2d at 739 ("To the extent that this holding conflicts with *Barney*, *Barney* is overruled.").

[21] But, the Government fails to mention that Section 474.51(1)(3) was enacted in 1976, as part of the State Transportation Preservation Act, more than a century after most of the easements at issue in this case were obtained. *See Twp. of Bingham* v. *RLTD R.R.*, 576 N.W.2d 731, 733 (Mich. App. 1998).

The court declines to adopt the Government's arguments for several reasons.  First, under Michigan law, the "extent of [a railroad's] right and possession [is] restricted to *railroad purposes*" when it acquires its interest via prescription or condemnation.  *See Garfield*, 290 N.W. at 835 (emphasis added),   The Government's position that recreational uses are within the scope of a railroad easement,  however, would require that the court conclude that, under Michigan law, "railroad purposes" include "recreational purposes."  *See Nordhus*, 98 Fed. Cl. at 338 ("To state the obvious, removing tracks to establish recreational trails is not consistent with a railroad purpose[.]")

The Michigan Supreme Court has rejected this rationale.  In *Carmody-Lahti*, the deed at issue conveyed an easement "for railroad purposes only."   699 N.W.2d at 275, 285.   In determining whether the railroad abandoned this easement for "railroad purposes," the Court relied on the fact that the railroad indicated an intent to stop using the easement for "railroad purposes" by "both seeking federal permission to abandon its railroad and removing the rails themselves."  *Id.* at 288.  The Court further concluded that these actions demonstrated a clear intent not to continue using the easement for "railroad purposes."  *Id.* at 288-89.  As such, the Court reasoned that recreational use of a railroad easement by the public is not a "railroad purpose" under Michigan law.  *Id.*

It is true that the Michigan Supreme Court has held that a railroad that previously condemned a right-of-way later could install braces and cross-pieces to support a bridge over the land, without committing a second taking.  *See Barnes*, 32 N.W. at 426.  In *Barnes*, the rationale was that the bridge work was not "so plainly repugnant to or varying from the purpose originally contemplated as to amount to a change of user."  *Id.* at 427.

In this case, by contrast, conversion of the Railroad easements into a public recreational trail transforms the nature of the easement and is substantially different from the original use.

As the United States Court of Appeals for the Federal Circuit explained:

[I]t appears beyond cavil that use of [railroad] easements for a recreational trail— for walking, hiking, biking, picnicking, frisbee playing, with newly-added tarmac pavement, park benches, occasional billboards, and fences to enclose the trailway—is not the same use made by a railroad, involving tracks, depots, and the running of trains. The different uses create different burdens. In the one case there was an occasional train passing through (no depots or turntables or other appurtenances are involved on these rights of way). In the other, individuals or groups use the property, some passing along the trail, others pausing to engage in activities for short or long periods of time. In the one case, the landowner could make such uses of the property as were not inconsistent with the railroad's use, crossing over the tracks, putting a fruit stand on one edge of the property, or whatever. In the other, the government fenced the trail in such a way as to deny that access.

> Some might think it better to have people strolling on one's property than to have a freight train rumbling through. But that is not the point. The landowner's grant authorized one set of uses, not the other.

*Toews*, 376 F.3d at 1376-77.

As for the 1976 Act, the United States Court of Appeals for the Federal Circuit has squarely rejected the notion that subsequently enacted state legislation can alter the scope of an easement granted *prior* to the legislation in considering whether a takings claim arises by the issuance of a NITU.  *See Hash* v. *United States*, 403 F.3d 1308, 1315 (Fed. Cir. 2005) ("[T]he property rights of these early landowners are governed by the law in effect at the time they acquired their land."); *see also Preseault II*, 100 F.3d at 1540 n. 13 (rejecting the argument that state statutes enacted after a railroad easement was granted changed property rights that "were fixed at the time of their creation[.]").[22]

Finally, the court rejects the Government's argument that the possibility of reactivation at some hypothetical time in the future signifies that the Line is still being used for a railroad purpose.  Moreover, this result would be inconsistent with *Carmody-Lahti*, where a railroad that pursued railbanking and removed rails evidenced abandonment of the easement.  *See* 699 N.W.2d at 289 ("[The railroad] abandoned that easement for state property law purposes when it sought, obtained, and acted on the ICC's permission to abandon the railway[.]"); *see also Capreal, Inc.* v. *United States*, 99 Fed. Cl. 133, 146 (Fed. Cl. 2011) ("[R]eactiviation [of a railroad line under railbanking] simply is too remote for railbanking to be considered a permissible railroad use.").

For these reasons, the court has determined, in this case, that public recreational trail use exceeds the scope of the Railroad's easements.

## C.    *Preseault II*, Step 3: When Did The Easement Terminate?

The third step of the *Preseault II* analysis requires the court to determine whether an easement has terminated, *i.e.*, "so that the property owners at that time [of the NITU issuance] h[o]ld fee simples unencumbered by the easements." *Preseault II*, 100 F.3d at 1533.  The United States Court of Federal Claims repeatedly has held that there is no need to proceed to the third step of *Preseault II* if the court has determined that public recreational trail use is outside the scope of an easement. *See, e.g. Whispell Foreign Cars, Inc.* v. *United States*, No. 09-315L, 2011 WL 3805918 at *10 (Fed. Cl. Aug. 29, 2011) ("[T]he court has determined that recreational trail use is not within the scope of the easement, [thus] the court need not determine at this time whether the easement was abandoned under Florida law.") (*citing Preseault II*, 100 F.3d at 1533). Since the court has determined that Michigan law does not authorize public recreational trail use of railroad easements, the court need not proceed to the third step of *Preseault II*.

---

[22] In *Preseault II*, our appellate court observed that, if a state statute operated to divest the plaintiffs of their reversionary property interest, this "would constitute a separate ground for finding a governmental taking."   100 F.3d at 1540 n. 13.

For these reasons, the court has determined that the Non-Conveyance Plaintiffs in this case were forestalled from acquiring their reversionary fee simple absolute interest on April 3, 2008, the date the first NITU was issued.

## X.     CONCLUSION.

The Government is entitled to summary judgment as to claims based on the Lovell and Avery deeds.[23]       Accordingly, those claims are dismissed.  Sec. Am. Comp. ¶¶ 28-30 (the Caswells), 109-111 (Vanderhyde-Ionia), 112-114 (the Vernons).  *See* RCFC 56(a).  In addition, summary judgment is denied as to both parties with respect to claims based on the Barber deed.

The court also has determined that the Non-Conveyance Plaintiffs have established a reversionary property interest in the easements on their properties and that the April 3, 2008 and October 28, 2008 NITUs have taken these interests for Government use.  Accordingly, the court grants summary judgment on behalf of the Non-Conveyance Plaintiffs with respect to those two elements, leaving the issue and amount of just compensation for trial.

Finally, by no later than January 9, 2011, the remaining Plaintiffs who did not move for summary judgment, but whose claims are based on deeds that are identical or similar to the Lovell and Avery deeds, shall show cause as to why their claims should not be dismissed for the grounds stated herein.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

---

[23] The Vernons are alleged successors-in-interest to the land originally conveyed by the Avery deed.  Pl. Mot. at 10 (citing Pl. PFUF Exs. A123-124).  The Caswells and Vanderhyde-Ionia are the successors-in-interest to land originally conveyed by the Lovell deed.  Pl. Mot. at 10 (citing Pl. PFUF Exs. A66-67 (Caswells), A121-122 (Vanderhyde-Ionia)).